Leslie Sun, the appellant. Your Honor, this case involves two significant legal errors by the administration, by the government, in deciding social security cases. And I was looking for something that kind of encapsulates the reason why this case is so important and it's so much more important than just a woman who was abused and broke her ankle and alleged a period of disability. It's important for the reason that this court is held repeatedly and the principle of that the reasons are the handmaidens of judging in decision making. That every court must issue reasons for its decisions. That there must be some basis in fact or evidence to make a decision. The record in this case was grossly insufficient at the time. The judge was fully aware that the record included evidence that she had reported that she had received medical treatment through the Medical Center of Louisiana, through the interim system. That she had a major reconstructive surgery done in December of 2011. She gave the specific date of the surgery. She gave her medical record number. She advised the The judge at the hearing, despite that evidence, repeatedly asked her where she was receiving treatment. Even after she had initially testified that she was receiving treatment and had, in her words, a major reconstructive surgery at LSU in December of 2011. The judge then asked her where she was receiving treatment. He said, I have a couple of problems. There's no evidence that you're receiving any treatment. Of course, this despite the fact that she had already previously advised them in both written and oral testimony that she had indeed been receiving treatment. The record shows that Social Security sent two requests for those records that were not answered. Apparently when Ms. Sonn then obtained an attorney, the attorney was able to, I don't know how easily, but get the records. I don't know if you were the one who obtained those records. Why the discrepancy? I don't know. They sent two requests. Neither of them were responded to, apparently. Neither of the requests were sent by the judge, but rather someone in the judge's office. They didn't identify the judge. Neither of them, I also note, your honors, is that they didn't include her medical record number on them. But moreover, is that... You discern legal reversible error along the lines of the Rosa decision committed by the ALJ, or are you alleging too perfunctory treatment by the appeals level? The judge failed to fully develop the record. Okay, but that runs into our Higginbotham case, because by the time I guess you step in, the record is perfected and it's fully before the appellate panel. Yes, but the appeals counsel issued no findings whatsoever. Their decision is merely a boiler plate. It contains not one scintilla of fact relative to the evidence which was submitted to them. Is that the reversible error? Absolutely, your honor. Absolutely. Okay, but let's break this down a teeny bit, because when I look at the CFRs, I think it's 1512, the burden is on the claimant to bring the medical records. But then there's the corollary, which is the judge should assist and should help. So in this case, if she didn't bring it, the records, he starts probing verbally and there's miscommunication. Then the attorney gets involved and the record gets perfected. No one's really to blame. She couldn't fulfill her CFR. Judge didn't get them as further, sent two letters. So really the only legal error isn't some affirmative duty to get records for a claimant who has the responsibility to give the records over. The error that would have to exist would be the appellate level not to sufficiently discuss the records once they've been gotten. Yes. Do you agree with that? So this is an EPS case. This is not a failure of affirmative duty case. Absolutely. Absolutely. I agree that it's an EPS case in that sense. The appeals counsel was duty bound under these facts, given the fact that the record was not fully developed, to evaluate the evidence in some way. 970B requires that the appeals counsel not only just consider the evidence, and they merely regurgitated the word consider in its decision, but it must also evaluate the evidence. But the EPS case, the new evidence was explicitly contradicting the ALJ's ruling. So in that context, you could see why our court would say you've got to discuss it. But here, what it shows, I guess, gets into the real factual difficulty. Somewhere around about a year, she began to walk without crutches. That's fair to say. That's fair to say. And in fact, she told them somewhere around a year, the facts are arguable. It's not conclusive one way or the other. It was an issue of a trier for the trier effect. The judge, to investigate that and to make a finding as to the listing, and when she returned to effective ambulation. So the new records don't conclusively show ALJ's wrong. ALJ relied on her statement that I thought I was walking in May. That's a year. Why isn't that substantial evidence? Well, consider this. She told them probably in May. In fact, to clarify, she said, I stopped using the crutches after my last appointment, probably in May. However, the fact is her last appointment was in actuality in June. In April, the x-ray revealed a nonunion of the fracture. A reasonable mind would conclude that someone would have significant pain with nonunion. Yes. And she also reported, I might add, on a form where she advised the judge of her treatment, where she advised the administration of her appointment dates, etc., and her medical record number, that she was unable to walk with the boot. She could begin weight bearing in April, begin weight bearing, but she had specifically reported that she was unable to walk on the boot. The listing is effective ambulation. That's walking, not weight bearing. The fact of an individual beginning weight bearing does not conclusively establish that they're able to ambulate effectively. Rather, her testimony, as well as what she had reported to the administration, would seem to lead a reasonable mind to conclude that she was indeed not effectively ambulating as of June of 2012, until June of 2012, and then it's arguable after that because she still required two months of therapy. The boot was removed in June. I thought the ALJ found that there was conflicting testimony. Did he make a finding that she testified the boot was taken off six to eight weeks after the early January visit? And he also had these credibility problems with her testimony. So how do we factor all that into this? Well, I mean, the credibility analysis by him was based on a misstatement of fact. The credibility analysis was based on her failure to follow up with treatment, which is a material misstatement of fact. Because they didn't have the records. Exactly. Which leads me back to my initial point, being that the reasons stated in the ALJ's decision are based on a material misstatement of fact. She was not in treatment. I am discrediting her on the basis that she did not receive appropriate care, when in fact she did, when in fact he was aware of that. But it was also based on her statement, inartful, incorrect, to him directly, I was walking by May. Probably by May. Her exact words were probably by May. I was not using the crutches. But she was still in the boot and she testified that she used the crutches until the boot was removed, which would make sense. A large, unwieldy boot with a non-union fracture, it would make sense that an individual, a reasonable mind, could conclude that an individual would have some difficulty ambulating with a giant boot on their foot to do various activities, shopping, banking, walking without the aid of two crutches. The regulation, though, talks about permitting independent ambulation without the use of a handheld assistive device like crutches or a wheelchair. She testified that she was using the crutches until the boot was removed. So therefore, if she were using the crutches to ambulate while she had the boot on, that would take her through June of 2012. We can logically conclude that if she required the boot, and given her prior written testimony to the administration at 210 in the transcript, that she could not walk, ambulate, on the boot. So, Your Honor, she was clearly, or by her testimony, was using the crutches, both crutches, to assist with ambulation through June of 2012 when the boot was removed. Our cases require the ALJ to develop the evidence. Here, she mentioned these other visits. He asked her about those visits. I understand he didn't get the records, but why isn't it enough that he developed the record based on her testimony about those visits? And what's your best authority for saying he needed to go and actually obtain the records as opposed to just develop them? The function of the ALJ is not to merely sit and listen. It is not to act as an assembly line. And in the words of this Court, it is the duty of the administrative law judge to develop the facts relative to a claim for benefits fully and fairly. To me, that implies he makes some effort to secure the evidence of an unrepresented individual who's unsophisticated in the regulations, who's unable to make an argument at step three as to the listings, or we're not even sure who understands step five for that matter. But the best case for that, because it is a little hard, you've got a bunch of, I mean, the framework seems to be, you know these CFRs, 1512. She has to produce the records. That's her responsibility. And he must reasonably help, which two inquiries to LSU would seem to be an effort, doesn't get anywhere, then he starts asking questions. But we also require, but you know, the line of course, the line of cases in this circuit require that an ALJ scrupulously and conscientiously probe into the facts. Is it scrupulous to claim in a decision that an individual has no medical treatment and to discredit them entirely when that statement has no basis in fact, to claim that there is no evidence of any medical treatment when in fact she had testified to it repeatedly, when in fact she had advised them of that? Is that... That's just an issue of what you think are incorrect factual findings more than a duty to go and develop additional evidence. But had he developed the evidence, it might have led to a different decision. Sending it out to the hospital to request that we're not answered isn't enough. At what point would it have been enough where, you know, I mean, obviously there's so many of these cases, there's to be some point at which they've done enough. Judges have subpoena power. They could have subpoenaed for the records. He could have sent a request after the hearing, signed by him. He could have ordered his staff to do a follow-up phone call. My office received the records within a matter of 20 or 30 days after requesting them. But all of it gets corrected, right? The appeals council has it. That's where the appeals council failed. And that's the true failure of this case ultimately. Not so... If we... Going... Getting beyond the judge's decision is the appeals council has flagrantly violated their own regulations as well as the precedent in this circuit. Epps, Higginbotham, as well as 970B. They have issued a generic boilerplate decision after receiving substantial evidence which refuted the basis for the judge's finding. Again, we go back to the fact that the judge discredited her on the grounds that she had no treatment. Right, but you would agree the records you gave to the appeals council in no way reflect when she actually was walking free. Exactly. And that's why it's an issue for the trier fact. That's why all we're asking is to give her a chance. And additionally, beyond that, for the appeals council to follow its own rules, for the government to do what it says it's supposed to do and what it's imposed on to do by this court. They have failed in that respect and they do so, and I practice this type of law and have done so for quite some time. The appeals council has repeatedly done this. They issue boilerplate decisions where you make specific arguments, you submit new evidence, and you get a decision that says virtually nothing, except we considered it and we found no basis under our rules to change the decision. The same exact letter that was issued in the 1980 case of Epps. The same denial, saying nothing. Here we submitted substantial evidence that could have led to a different result. Arguably, it could have resulted in a different decision. What circuit did Rosa come out of? Second. That case, though, is a case where the ALJ is going to disagree with the treating physician's conclusions. You would see, then, that affirmative duty to call for records would be more sensible. Here, you agree. There was no sort of just disagreeing with a treating physician. No, because he, well, really, there was no treating physician to rely on. He didn't know the second surgery had even happened. Exactly. Well, he should have known. He was informed of the December surgery. She told him. Well, she told him in writing in January of 2012. She gave them that information. The request wasn't sent until months later after the hearing had been scheduled, I might add. So were they derelict in their duties by sending two requests? Not per se, but did they scrupulously and conscientiously probe into and inquire of all relevant facts? Certainly not. And the fact that his decision was based on a complete misstatement of fact, which was later proved to be true, and then a subsequent decision which includes no evaluation of that evidence, clearly establishes legal errors which cannot go unnoticed. Thank you. Good afternoon. May it please the Court, my name is Eric Poole and I represent Carolyn Colvin, the Acting Commissioner of Social Security. We intend to briefly cover two issues today. As you've noted already, the first issue is whether the ALJ fully and fairly developed the record. The second issue is whether any failure to develop the record was prejudicial to the claimant. With respect to the first issue, the ALJ based its decision on a properly developed record. The ALJ has a duty to develop the record fully and fairly. At the same time, the claimant has the responsibility to provide the Commissioner with medical evidence of her decision based on the evidence that's available to the ALJ. So is there an easy answer to who was ultimately responsible to get the medical records? Yes, sir, I believe there is. The ALJ, because the claimant was not represented, he had a heightened duty. He had a duty to make every reasonable effort to help her get the... Help her, but the preliminary duty is still hers? Yes, sir. And so then the help was done by the two letters as well as the verbal inquiry of her? That is correct. But would you agree with their characterization that ultimately he was wrong? He didn't believe that she'd had the second surgery? No, sir, I don't. And the reason that I disagree lies in the text of the ALJ's decision. He correctly pointed out that there was a lack of follow-up treatment. But if she had surgery in December, that's pretty significant follow-up treatment. Yes, sir. He said in the text of the decision, he said that he was giving her the benefit of the doubt that the December 2011 surgery took place. Oh, he does say that? Yes, sir. Okay. The treatment that she didn't get was after the injury of the ankle occurred on about May 18th. First sought treatment on about May 28th. The first surgery took place on June 15th. Of 2011? Of 2011, yes, sir. So then the whole question becomes May 2012, right? Yes, sir, that's correct. Go ahead. So you're saying that the ALJ understood that she did get the second surgery in December, so therefore he would have known that by April, which is getting really close to the May date, she's just coming out of a second surgery, and he understood all that, even though he didn't have the records? He did not have the records. The ALJ understood that she had surgery in December. He did not have and never received those records. He did not have those records before him. He made his first request in April of 2012, second request in May of 2012, held the hearing in July of 2012. She comes in and she's not on crutches at that hearing, but that doesn't tell us anything about what she was doing in May, right? No, sir. He didn't draw an inference that because she's not on crutches now, she wouldn't have been back in May, did he? Not explicitly, no, sir. No, sir. To be clear, the commissioner's contention is that Ms. Sun became able to ambulate effectively as of April 11, 2012. This is the day on which Dr. Gorman released her to bear weight on a controlled ankle movement or walking boot. Okay, and that medical conclusion became available to whom? Never to the ALJ, but yes to the Appeals Council? That is correct. It was not available to the ALJ. It was available to the Appeals Council. Okay, but then this really does, in my mind, reduce down to an EPS case, which is the Appeals Council gets the critical fact that you say determines that she could walk within a year, but then they don't discuss it and don't mention it. It's pretty perfunctory. Yes, sir. The commissioner's position is that EPS has been superseded. Did you write that in the brief? No, sir. No, sir. The Appeals Council did not provide a detailed discussion of the LSU clinical reports, and when I refer to those, I'm talking about the records from December of 2011 through June of 2012. The Appeals Council did not provide a detailed discussion of that evidence, but it had no obligation to do so under this Court's Higginbotham decision, and I'm referring explicitly to footnote one, which references agency policy, and that agency policy is still in effect. Pursuant to agency policy, the Appeals Council has no obligation to provide a detailed discussion of additional evidence submitted to it. We do not cite in the brief the HALEX. This is something I always heard people talking about. I did not know what they were referring to. That's the agency's hearings, appeals, and litigation law manual, section I3590. I'd be happy to provide that to you in supplemental briefing. But that sets forth the commissioner's internal policy and sets forth the proposition that the Appeals Council has no obligation to provide a detailed discussion of additional evidence submitted to it. Okay, so your argument now, your entire argument now, has come down to an argument you didn't make in the brief, but it's footnote one in Higginbotham. So it's the statement, it appears that the requirement of detailed discussion of additional evidence was suspended by a memorandum of the executive director in 1995. And so EPS is a what, a 1983 decision, and that's been superseded? Yes, sir. Now, we do cite Higginbotham. Oh, I know you cite Higginbotham, but that's a substantial change. I mean, your opponents had no opportunity to respond to that. You haven't briefed that at all to us. No, sir. The statement that the Appeals Council had no obligation to make this kind of detailed discussion of the LSU clinical reports, that's what I'm saying now. I know, but what you're also saying is that a published decision of our courts has been superseded by another case. Well... How would Higginbotham have the authority to do that? EPS was from 1980. It preceded the memorandum that Higginbotham refers to. Perhaps superseded is too strong. There's a conflict between Higginbotham and EPS. Under EPS, your case is hard? If EPS still controls? No, sir, I don't think so, because EPS involved conflicting medical events, as I recall. The facts are materially different, because there were allegations of some type of... I'm sorry, I'm drawing a blank on the facts, but there was a conflict. There was conflicting medical evidence submitted to the Appeals Council in that case. Our argument is that we're citing Higginbotham and footnote one for the... I don't want to reiterate too many times, but we're simply making the contention that the Appeals Council didn't provide a detailed discussion, but it had no obligation to do so under Higginbotham. So it's got no obligation to discuss it, as EPS seemed to imply that it did. And therefore, if the records below disprove a credibility assessment made by the ALJ, the Appeals Council can just not discuss it, and thereby it's sort of immune from appellate review? Is your position that they just don't need to discuss evidence that may be inconsistent with an ALJ, and if they don't discuss it, there's no ability to reverse the Commissioner's decision? Well, no, sir. The Court certainly would have the ability to review the Appeals Council's decision as part of the decision, the Commissioner's decision made below. That's what I would say Higginbotham stands for. So I'll move to the second issue, which concerns prejudice at step three of the sequential evaluation process. So it looks standard, isn't it? It just has to be that the evidence might have made a difference, not that it was more likely than not it would have. What in the ALJ's decision can you point to that showed he would have made the same decision even if he had those medical records? That he considered section 1.01 of the listings. Section 1.01 includes the listings that relate to musculoskeletal impairments, and that includes listing 1.06. That's what we could point to. There are two prongs to listing 1.06. The first prong is the fracture, which he discussed. The second prong is the inability to ambulate effectively, which he also discussed. Now, the critical evidence from April 2012 was not available to him. He discussed what was available to him, including his son's ability to amulate at the administrative hearing. That's because you think the April evidence shows she wasn't unable to walk through that May period. Yes, sir. And what exactly is it in that record of the April medical visit? That is the evidence from Dr. Gorman, one of the LSU physicians who released Ms. Sun to bear weight in a walking boot on April 11, 2012. And that evidence is bolstered by the follow-up from June 4, 2012, follow-up from Dr. Krause, saying that Ms. Sun was doing well, had been, past tense, had been bearing weight as tolerated in her walking boot, and could thereafter bear weight without the walking boot. And an x-ray at that time, June 4, 2012, also showed that the fracture had healed. No mention of crutches, though, either way, if she was off the crutches or still on them? No explicit mention of crutches, no, sir. No explicit mention either way. She was, no, sir. So to cut to the two prongs that I've set forth, Ms. Sun satisfies the first prong of listing 1.06 with her ankle fracture, but she does not satisfy the second prong. She injured her ankle on May 18, 2011, and then on April 11, Dr. Gorman indicated, did not opine, but indicated that Ms. Sun could ambulate effectively when she released her to bear weight in a walking boot. Then, additionally, and I don't, I won't repeat so closely, but on June 4, the evidence from Dr. Krause bolstered the evidence from April 11, that includes the comment about having been bearing weight in the walking boot. So the Commissioner's contention is that the record reveals that Ms. Sun could ambulate effectively without using handheld assistive devices less than 12 months after the onset of her injury. So if there, if you have no further questions, in conclusion, the Commissioner's position is that substantial evidence supports the ALJ's determination that Ms. Sun was not disabled during the relevant period, and for the reasons that we discussed today and in our brief, the Commissioner respectfully submits that the ALJ committed no error as a matter of law or fact that warrants a reversal remand. If there are no further questions, thank you. Thank you, Your Honor. First of all, Higginbottom does not stand for a dissolution of the AC's requirement. They were merely citing in a footnote that the appeal, noting, recognizing the fact that the Appeals Council had temporarily, this is 20 years ago, suspended its requirement for a detailed discussion. The Court in Higginbottom did not even mention EPS. They're following EPS in this decision, not superseding or overturning it in any way. It's a footnote recognizing the fact that the administration determined unilaterally that it was going to suspend temporarily a first-hand memory of that memorandum. I read the case this morning. You read again about the footnote one, but do you know about the memorandum? How do you know it was a temporary suspension? That's what it cites in the footnotes. It says that in the words. It says a temporary, yes. This was 20 years ago. Is there value? Would you, if you had a chance to look at it, you didn't realize this is the front of their argument now, would there be value for you to brief this issue? I thought it was somewhat disingenuous for them to cite a footnote from Higginbottom. It follows my case. The holding is that the record before the Appeals Council constitutes part of the final record before this Court. The final record and the final decision of the Commissioner. Thus, Higginbottom resolved a split amongst the circuits. That's the importance of Higginbottom. It's procedural in that sense. It involved a split amongst the circuits to an adjunct, so to speak, of the ALJ's decision, and therefore was it part of the final decision of the Commissioner. Thus, by extension, by that holding, it must include some findings. In fact, the Court in Higginbottom reversed for consideration of new and material medical evidence. They remanded it back for consideration of that evidence. To say that it— Do you do that in the first instance? Let's say we find an EBS error precisely along the Yes. What if—what's your answer to his suggestion that the record that they would have found shows that on April 11th your client could walk? Yet she testified that she was in a—we know for a fact she was in the walking boot until June. We know for a fact that— But what's the record that is of value if—in other words, if our point to saying to the in there that would be in any way valuable? In terms of the medical evidence? In terms of ascertaining when she could walk again or not. Well, her testimony, as well as what's documented— But her testimony isn't the new evidence. The records themselves, because it's corroborative of her testimony. She was to begin weight-bearing in the boot beginning in April, but she still had a nonunion of the fracture. The nonunion of the fracture, we know for a fact, did not heal until June. We know for a fact the moved until June. A reasonable mind could conclude that someone who has a large unwieldy boot with a nonunion fracture and who testified to significant difficulty ambulating with pain would be unable to ambulate effectively for that period of time. Moreover, is she required— On the existence of the nonunion fracture in April, that was a fact that the ALJ did not have. The only place that exists is in the records that weren't discussed. Is that your—is that correct? Absolutely, Your Honor. Absolutely. And the boot was not removed until June. She initially responded that she was using the crutches until her last appointment again, probably in May. Probably. It was actually in June. We know for a fact it was June, which would meet the durational requirement. Moreover, the government is arguing facts here when the appeals counsel and the judge failed to articulate any factual basis for their decision making. This court has held in Haywood v. Sullivan, the appellate court may not issue factual findings on numerical evidence. It is not the job of the appellate court to examine new evidence and make findings of fact. The fact that we can sit here as attorneys and argue when she did return or when she didn't return indicates that it's an issue of fact for the trial court to decide. And I might add, with respect to the claimant's responsibility, here is someone who completely unsophisticated. Did the judge ever explain to her that he had requested records and not receive them? No. Did he ever explain to her her requirement that she make an effort? As a matter of fact, as a point in testimony, she said in his—her words, if I would have known that you all didn't have that, I would have went down there and requested it myself. Had they just informed her that they could not get a response, she might have went down there and gotten the records herself. But she was never given the opportunity, and the judge made no effort after the hearing. So again, my opponent's characterization of Higginbotham is completely and utterly incorrect. And moreover, their argument is that it's no detailed discussion. There was none. If their position is that the Appeals Council is not required to have a detailed discussion by some non-binding, non-legal executive order issued 20 years ago, supposedly temporarily, then my argument and response is they're making my argument. There was no discussion. It requires some discussion. At least explain why you found the judge's decision to be correct. At least give the claimant and this Court some opportunity to review that. We have done not. We've got your argument. Why don't counsel file, by close of business on Friday, simultaneous letter briefs as to whether or not the government's position is that Epps has been superseded by that footnote in Higginbotham? Thank you very much. Thank you, Judge. Appreciate it. Thank you. And we will call the last case of the day, 14-30433, Allen v. Keller.